UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

GEORGE ABELLA,

        *Plaintiff*,

    *v.*

STEVEN MADDEN, LTD *and* STEVEN MADDEN
RETAIL, INC.

        *Defendants*.

------------------------------------------------------------------------x

**COMPLAINT**

**14 Civ. 5282**

Plaintiff, George Abella, by counsel, The Harman Firm, PC, alleges for his complaint against Defendants Steven Madden, Ltd. and Steven Madden Retail, Inc. (hereinafter "Defendants") as follows:

## PRELIMINARY STATEMENT

1.    In this employment discrimination action, Plaintiff Abella seeks damages and costs for Defendants' willful, improper, and illegal termination of his employment.

2.    This matter arises under the Civil Rights Act of 1866, 42 U.S.C § 1981 and New York City Human Rights Law § 8-107. Defendants created and fostered a racist, sexist, and homophobic office environment in which Mr. Abella was forced to work. Upon reporting this egregious and intolerable conduct to Human Resources, Mr. Abella was terminated by Defendants in a clear act of retaliation.

## JURISDICTION AND VENUE

3.    Jurisdiction over Plaintiff's claims is conferred on this Court by 28 U.S.C. §§ 1331 as Defendants violated Plaintiff's rights under 42 U.S.C. § 1981.

4.     The Court has supplemental jurisdiction over Mr. Abella's claim brought under New York state law pursuant to 28 U.S.C. § 1367.

5.     Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) as all acts complained of occurred within this District.

## TRIAL BY JURY

6.     Plaintiff respectfully requests a trial before a jury.

## PARTIES

7.     Plaintiff, at all times relevant hereto, was and is a resident of Queens County, New York.

8.     Upon information and belief, Defendant Steven Madden, Ltd (hereinafter referred to as "Steve Madden") is a corporation organized under the laws of Delaware and headquartered in Queens County, New York.

9.     Upon information and belief, Defendant Steven Madden Retail, Inc. (hereinafter referred to as "Steve Madden Retail") is a subsidiary corporation of Defendant Steve Madden, organized under the laws of New York and headquartered in New York County, New York.

## STATEMENT OF FACTS

10.     Plaintiff, Mr. Abella, began his employment with Defendant Steve Madden in or around September of 2013.

11.     Mr. Abella was initially hired by Defendant Steve Madden as a part-time file clerk in the Human Resources ("HR") office and was paid at a rate of eleven dollars ($11) an hour.

2

12.     In or around October of 2013, Defendants transferred Mr. Abella from the HR department to the international payments department. Defendants increased Mr. Abella's pay to twelve dollars ($12) an hour.

13.     When Mr. Abella began working in the international payments department, he immediately noticed that his supervisor, Ishri Balram, and his co-workers, Ishri Balram, Karl McKenzie, Nile Graham, and Sonya Rametra, regularly used racist, sexist, and homophobic language.

14.     Mr. Abella could not avoid hearing the derogatory language, as he, Mr. Balram, and the other international payments employees all worked together in the same, small office space at Steve Madden.

15.     Mr. Abella is Filipino and as a result, he was frequently the target of racist "jokes" and epithets directed against Filipinos and other Asians.

16.     Mr. Abella's co-workers regularly joked about the shape of his eyes, mocked him for not knowing Chinese, suggested that—as a Filipino—he ate dogs, and regularly used racist and derogatory terms such as "chink."

17.     Mr. Balram regularly received emails from Chinese vendors and would give Mr. Abella documents partially written in Chinese, even though he knew that Mr. Abella was Filipino and did not speak any Chinese languages. When Mr. Abella would tell Mr. Balram that he did not understand the portions of the documents written in Chinese, Mr. Balram would embarrass Mr. Abella in front of the entire department by demanding, "why did we even hire you if you don't speak Chinese?"

18.     Mr. Balram would ask Mr. Abella if he had ever been to Flushing, Queens, which is purportedly well known for its Chinese population and insinuated that Mr. Abella would feel more comfortable amongst Chinese people.

19.     In addition to mocking his Asian heritage, Mr. Abella's co-workers also decided that he looked like a "Mexican" and would make racist comments toward him that disparaged Mexicans and other Hispanics.

20.     Defendants' employees would make jokes about how Mexican people are "dirty" and called Mr. Abella a dirty Mexican.

21.     Defendants' employees would taunt Mr. Abella, whose first name is George, by insisting that the proper spelling of his name was "Jorge" and would call him "Jorge."

22.     Defendants' employees would routinely direct racist terms, such as "wetback" and "spic," at Mr. Abella.

23.     In addition to racial abuse, Defendants' employees would regularly assert that Mr. Abella was "homo," "gay," and ask him if he liked "same love."

24.     Each time the Macklemore's song, "Same Love," would play on the radio, Karl McKenzie would taunt Mr. Abella that he participated in and enjoyed homosexual sex and that Mr. Abella was not a "real man."

25.     Karl McKenzie would perpetuate his image of being the only "real man" by grabbing the back of Mr. Abella's chair and violently shaking it. He would taunt Mr. Abella by threatening, "you scared, boy?"

26.     Defendants and Defendants' employees would maintain an atmosphere of hostility towards homosexuals by constantly denigrating people and things as "gay."

27.     Along with the homophobia, there was an atmosphere of chauvinism. Defendants' employees would refer to females as "ho's," a derogatory term, or "thot," a slang acronym for "that ho over there."

28.     Additionally, Karl McKenzie would advocate violence against women, stating that men should hit women "to keep them in their place" and that woman enjoyed it.

29.     Mr. Balram would have violent outbursts where he would kick and punch the filing cabinets and other office furniture.

30.     Mr. Abella was deeply offended by the comments and behavior of Defendants' employees.  For five (5) months, Mr. Abella suffered Defendants' harassment in silence for fear of retaliation from Defendants and his co-workers.

31.     In or around January of 2014, Defendants promoted Mr. Abella to a full-time position.

32.     In or around May of 2014, Mr. Abella received a performance review in which Mr. Belram said Mr. Abella was "a valuable and needed addition to the team," that Mr. Belram was very pleased with Mr. Abella's work, and that after a year, Mr. Abella would get a more independent position in the team.

33.     Mr. Abella received a $0.50 raise in recognition of his excellent performance review.

34.     On Thursday, June 26, 2014, Mr. Belram threatened Mr. Abella by repeating to him "calm down, bro" in an aggressive tone.

35.     Mr. Abella was shaken and asked if he could leave early.  Mr. Belram answered that he could leave "right now."

36.     Mr. Abella logged out and went to the HR department to complain about Mr. Balram, the ongoing hostile work environment in the international payments department, and how upper management enabled the discriminatory behavior.

37.     Mr. Abella expressed concerns to Defendants' HR representative about the Defendants retaliating against him for making a complaint. Defendants' HR representative assured Mr. Abella that he would not be retaliated against and encouraged Mr. Abella to go into detail about what had happened with Mr. Balram and the conduct of the accounts payable department supervisors—who supervise the international payments department—and Defendants' HR representative stated that others previously had complained of similar behavior to HR about Mr. Balram and the accounts payable department.

38.     Mr. Balram witnessed Mr. Abella leave HR and followed Mr. Abella off of the premises where Mr. Balram questioned him.

39.     Mr. Abella informed Mr. Balram that he had spoken with HR.  Mr. Abella did not describe to Mr. Balram the nature of his discussion with HR.

40.     That evening, Mr. Abella received a phone call from Defendants' HR department telling him to take the next day, Friday, off as well, and to "gather himself" over the weekend.

41.     On the next Monday, June 30, 2014, Mr. Abella returned to work.  Upon entering the building, Defendants' receptionist stopped Mr. Abella and instructed him to go to the HR department.  Mr. Abella went to the HR department and had a meeting with Defendants' HR representative.

6

42.     During this meeting, Mr. Abella learned that, after he had made his complaint the previous Thursday, a number of employees from the international payments department filed complaints with HR alleging that Mr. Abella was a violent person.

43.     Mr. Abella had not done anything violent or threatening at any point in his employment with Defendant and denied the allegations made against him during the meeting.

44.     Mr. Abella asserted that the same people who were responsible for the racist, hostile atmosphere that he had originally complained about, Ishri Balram, Karl McKenzie, Nile Graham, and Sonya Rametra, were also the ones responsible for the subsequent complaints made against him, and he told the HR representative that the complaints against him were made in retaliation for going to HR.

45.     There had never been a complaint made against Mr. Abella before he complained to HR, and Mr. Abella received a positive performance review a few months earlier.

46.     Despite the overwhelming evidence that Defendants' employees had fabricated the complaints against Mr. Abella at Mr. Balram's direction, Defendants terminated Mr. Abella's employment immediately.

47.     Mr. Abella was given no opportunity to appeal this decision, and Mr. Abella's initial complaint was ignored.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Defendants violated the Civil Rights Act of 1866, 42 U.S.C. § 1981

48.     Mr. Abella hereby realleges and incorporates each and every allegation contained in ¶¶'s 1-47 with the same force as though separately alleged herein.

49.    Section 1981 prohibits discriminatory termination and retaliation for complaining about discriminatory practices.

50.    Defendants permitted their employees to discriminate against Mr. Abella in the terms and conditions of his employment when he was forced to subject himself to daily harassment from his co-workers and supervisor.

51.    Defendants' employees retaliated against Mr. Abella when he complained of the discriminatory harassment by filing false allegations with HR, and they intended that Mr. Abella's employment be terminated.

52.    Defendants then terminated Mr. Abella for opposing Defendants' unlawful discriminatory practices.

53.    As a result of Defendants' unlawful acts, Mr. Abella has been denied wages, salary, employment benefits, other compensation, and actual monetary losses.

## SECOND CAUSE OF ACTION
### Defendants violated the New York City Human Rights Law § 8-107

54.    Mr. Abella hereby realleges and incorporates each and every allegation contained in ¶¶'s 1-47 with the same force as though separately alleged herein.

55.    Section 8-107 prohibits unlawful retaliation or discrimination in any manner against any person because such person has opposed discriminatory practices under the New York City Human Rights Law.

56.    Defendants and Defendants' employees created a discriminatory work environment and discriminated against Mr. Abella.

57.    Defendants then terminated Mr. Abella in retaliation for his opposition to Defendants' unlawful discriminatory practices.

8

58.    As a result of Defendants' unlawful acts, Mr. Abella has been denied wages, salary, employment benefits, other compensation, and actual monetary losses.

## Request for Relief

**WHEREFORE**, Mr. Abellas respectfully request the following relief:

A.    for the First Claim, actual damages to be determined at trial, but in no even less than $400,000;

B.    for the Second Claim, actual damages to be determined at trial, but in no even less than $400,000;

C.    reinstatement;

D.    an award of compensatory and punitive damages;

E.    pre-judgment and post-judgment interest;

F.    attorneys' fees and costs; and

G.    such other relief as the Court sees fit to award.

Dated:    New York, New York
Tuesday, September 9, 2014

By:    Walker G. Harman, Jr.
THE HARMAN FIRM, P.C.
*Attorney for Mr. Abella*
1776 Broadway, Suite 2030
New York, NY 10019
(212) 425-2600
wharman@theharmanfirm.com

9